May it please the Court, my name is Paul Huffman, I represent the appellants and plaintiffs in this action. In the opening remarks, I'd like to focus my attention on this Court's decision last week in Rio Tinto as it applies to the political question issue in this case and the other issues. I'd also like to address the government's argument with respect to international comedy based on certain proceedings going on in the Colombian courts. And finally, if I have time, I'd like to say something about the Foreign Affairs Doctrine, which its political question and Foreign Affairs Doctrine were the two grounds on which the plaintiff's complaint were dismissed by the District Court. The Rio Tinto case that was decided last Thursday, in many ways, is a much stronger case for the application of the political question doctrine than this case. And I think the analysis in Rio Tinto is clearly controlling of the situation that confronts this Court with respect to the application of the political question doctrine by the District Court below. In both the Rio Tinto case and in this case, the State Department submitted statements of interest that said that there would be adverse effects or could be adverse effects to U.S. foreign policy because of the existence of the litigation. In neither statement of interest did the State Department say that there was a specific conflict in a way or that the case had to be dismissed. They expressed the foreign policy concerns of the United States government. In the Rio Tinto case, the specific conflict there was a statement by the State Department that the existence and further proceedings in that lawsuit would interfere with an ongoing peace process that was going on within Papua New Guinea that the United States had an important interest in. In this case, the concerns I would submit are much more generalized policy concerns that really don't have very much to do with anything that's in our, I would humbly say, small case on behalf of three plaintiffs against two companies in this country who are U.S. defendants for one discreet incident that occurred, which is a violation of international human rights law. In the Rio Tinto case, the Papua New Guinea government provided the court with an extensive statement about why the case would interfere with the peace process and would interfere, in fact, with regional peace and stability. Whereas in this case, the government of Colombia provided to the State Department a statement that the United States government gave to the court in the Rio Tinto case. It has been a very rare occurrence that an alien tort statute case has been dismissed on the political question doctrine grounds. In fact, until recently, there hadn't been any cases that had been dismissed on that ground for more than 20 years of litigation. The reason why some cases have been dismissed recently on that ground is that there are a number of cases arising out of the end of World War II that deal either with cases that are trying to overturn restrictions on the bringing of claims that were disposed of in the peace treaties that ended World War II. The most prominent example of that is the D.C. Circuit's opinion in the Zhu case regarding Korean comfort women, where the State Department provided an extensive statement of interest outlining 60 years' worth of treaties, executive agreements, and other formal, high-level policy decisions that that case would conflict with. In the Whiteman case, which is another variation, which is the Second Circuit case, where the court in a divided court came to a conclusion that the political question doctrine should apply there. There, the President of the United States had basically put the prestige of this court claim set cases that had resulted in a $5 billion settlement against German companies and the German government. And as part of that settlement had agreed to come before U.S. courts if anyone challenged that settlement. And that's what happened. Someone challenged, someone didn't like the settlement and challenged it. And the United States government filed a statement of interest indicating the level to which the United States government had committed its prestige and resources. And the court, as I say, reluctantly came to the conclusion that that was a case in which the political question doctrine should apply. And so we agree with you on that point. On political question? Yes. Yes. Well, the other thing that the Rio Tinto case does is no, I'm saying, if we agree with you on political question, is it over or is there another point in which it could have been properly discussed? Well, the other point on which the district judge dismissed the case was an application of the foreign affairs doctrine. Basically, that's the doctrine that is most notably associated with Zernick versus Miller and the Oregon case from a long time ago and the Garamendi case more recently. And in the district court, and this, again, is on the strength of the same statement of interest, decided that the foreign affairs doctrine trumped any state law claims that the plaintiffs may have. And as we've said in our briefs, I think that this is an extension of the foreign affairs doctrine that really has absolutely no support in law. There are three different parts of that. And the first two elements, I think, are the most important. And that is what Garamendi said, basically. There's a kind of three-part analysis. The first analysis is, is there some federal action that has the force of law that could conflict with general state tort law under the Supremacy Clause? The Supremacy Clause doesn't enforce federal government opinion. It doesn't enforce federal government concerns. It enforces federal law. And that's clear in Garamendi. In Garamendi, there was an executive agreement. I mean, in that case, there's a question about, is an executive agreement enforceable in that manner under the Supremacy Clause? And clearly, the Supreme Court thinks that an executive agreement is, particularly when it's associated with the resolution of claims after a war, which is where the – which this Court found in the Deutsch case, which is the zenith of presidential power. And there's a long history, going back 200 years, of presidents using executive agreements to dispose of post-war time claims, which the courts alluded to in Garamendi and this Court alluded to in the Deutsch case. And so there is a statement of interest expressing concerns about a case is not something that can be enforced against the states, against state law, under the Supremacy Clause. And if it could, there would still have to be a clear conflict between whatever that source of federal law is and general tort law of the state. And there is no clear conflict here. What the district court's main error is, he went to kind of amorphous balancing of interest without actually finding the predicate X that would allow him to enforce this under the Foreign Affairs Doctrine. So he was wrong on both of those grounds, I think. Both – and I think Rio Tinto – although Rio Tinto doesn't deal with the Foreign In fact, it may even be stronger in the context of federalism concerns that the court should not rely on a statement of interest to trump legitimate state authority. The other point that I wanted to raise, which goes, I think, to an argument that's been made only by the United States government – and in our papers, we have said that the appellees have waived this argument by not raising it in their answering brief. That's something the court will have to figure out in terms of whether this is actually before you or not. But what the United States government says is there's a proceeding in Columbia. And if that proceeding ends and there's a final judgment, under Colombian law, there's a double – a prohibition against double recovery, and therefore, the plaintiffs won't be able to get any recovery in this case. Now, in the district court, that issue came up in the context of the court's forum nonconvenience analysis, not in the context of international comedy. And what I would argue to the court with respect to international comedy is that, first of all, Rio Tinto decides, as this court decided in In re Assignment beforehand, that for international comedy to apply, there has to be a true conflict between some proceeding that's going on here and some proceeding that's going on there. This district court found that there was no true conflict. And that ends the matter from the standpoint of the international comedy decision. And I think what the district court was doing with respect to this issue is that this is the kind of issue that would get litigated when the case goes back down. It's not a ground for non-justiciability. If the defendants are right, that if there is a final judgment in that Colombian proceeding, and that is entitled to respect at some point by the district court in the course of this litigation, the district judge will decide that. And it will be decided – it's not a political question. It's not an issue that triggers international relations. It's the kind of things that courts do all the time, which is to try to figure out what the effect of foreign proceedings are on proceedings that are going on here. And there are legal principles under which those decisions get made. And I would emphasize – and this is another – one of the other insights in the Rio Tinto case, which I think is equally applicable here, is that in Rio Tinto, the court indicated that after the statement of interest had been submitted there, there were some further developments outside of the litigation that may or may not have some bearing on the litigation. The court was basing its decision on the original statement of interest with respect to political question, and it had never been withdrawn. But the – what it – what this Court said last week was, this is another reason why you don't base these kinds of decisions on opinions that are made in statements of interest, because things change. And, in fact, with respect to the Colombian proceedings, what the record shows is the Colombian proceedings that there's a judgment and it's on appeal. Everybody agrees that it's true. It's not final. From what we understand, there may even be a settlement of the case at some point. Now, the – that's not – And the other thing I'm – you can't decide on whether that's true or not. The reason I'm raising the point is that the alternatives are not judgment that gets sustained or judgment that gets reversed. There's a whole sort of – there are all kinds of other things that could happen between one point and another point, as what happened in the Doe v. Unical case, where this Court is a good example of that. And so the district court on remand would have to decide, whenever there's some kind of final decision in those proceedings, what relevance that is legally. And that's a legal decision. We understand we have to face that. We understand it's got to get briefed. But it's not a ground to dispose of the case at the beginning of the case. What would be your bottom line, because they're going to be here in a second? Yeah. Well, our bottom line is that the Court should reverse the district court on the political question and foreign relations ground. We also have an issue with respect to the TVPA applying to corporations that's been briefed. That doesn't dispose of everything, but that's a separate issue. So we think the case should be reversed. We think that the district court on remand should consider the issues in their current posture, since we haven't actually been before a district court for three years, and the Court should decide those issues with the benefit of the statement of interest and with the benefit of everything that's happened in this case. And this case, like so many other alien tort claims cases, should go forward to the next stage, and the issues will get litigated. And presumably, there'll be summary judgment motions, and maybe we'll be back. But that's the way the Court should handle it. I'd like to reserve the rest of my time, if I might. Thank you. Good morning, Your Honors. May it please the Court. My name is John Spiegel for Defendant, Appellee, and Cross-Appellant Occidental Petroleum, and five minutes of our time I'm sharing with United States as amicus here. You might want to get right to the political doctrine problem. Have you ever seen a case like this, with no more than this, where there's been a dismissal on political doctrine problem? Oh, absolutely, Your Honor. Where was the request in this case to dismiss? Excuse me, Your Honor? Where was the request to dismiss? Was the request made? Well, Your Honor, the State Department didn't specifically say dismiss the case. The State Department said adjudication will adversely impact our foreign relations. The United States, appearing amicus in this Court, has said, affirm the dismissal for particular foreign policy reasons based on the international comedy ground. And I would And we'll listen to the United States, but we're going to have to decide the case on the record before us. And on the record before us, Your Honor, this case stands unique. It stands unique because in this case, unlike any other of the many cases alleging human rights abuses in foreign countries by foreign governments and or U.S. corporations, in this case alone, the plaintiffs here have brought successfully a civil action to recover and have recovered a substantial monetary judgment against the Colombian military for all of their injuries from this alleged incident. And that recovery gives rise to the ability of this court, without reaching the constitutional issue of political question and justiciability, to affirm on the ground of international comedy without taking the step of getting to political question. And I will get to political question in a minute. And that's been the suggestion of the United States as amicus, which we fully join. Now, let's get to the political question issue here. This case is much, much stronger than the Rio Tinto case urged by appellant. After all, in the Rio Tinto case, the United States said in this court that the statement of interest was essentially no longer applicable because circumstances had changed and there was no effort by the United States to rely on specific foreign policy reasons seeking dismissal in Sarai. This is entirely different. The United States, the State Department here has said and the district court found, we have a preference for handling the Santo Domingo incident, this alleged bombing incident. It fits into a whole scheme of our foreign policy interests in Colombia, which are very important and complex. We're spending billions of dollars fighting a counterinsurgency there. At the same time, we're trying to promote and encourage, in the State Department's words, in the statement of interest, we're trying to encourage responsible legal mechanisms to address human rights issues. And that's what's happened in this case through the diligent efforts of the State Department, as is laid out in a very substantial record here of State Department activity, very much unlike the Rio Tinto case where the record was there was basically no involvement by the State Department and the US government. Here, what do you have? After the incident occurs in 1998, you have the State Department coming in January of 2003. This is in Memphis, they filed. Suspending aid to the Colombian Air Force unit involved. Not because they prejudged the merits. They said, you need to do, the State Department wanted an investigation. It was these responsible legal mechanisms for Colombia to use its own institutions to address this issue. And that's what happened in 03. The Colombian government then said in its diplomatic note, we are doing this. We are, and that was attached to the State Department's statement of interest, submitted to the district court. Our judiciary is addressing this, is investigating this. That's in February of 04. A couple of months later, you have a judgment and a 90-page opinion from a Colombian court awarding a very substantial monetary judgment against the Colombian military for the cause of action there is stated as a failure to protect civilians. But it is a full damage award. Doesn't have to be exactly what they would have won in a court here in the United States. But a very substantial damage award, I think in the government's brief, it was estimated at $700,000, which includes other victims, other civilians who were injured in the course of this incident. But it's a very substantial recovery, remedy. And under all of this court's cases and the Supreme Court cases, you don't have to get exactly what you get here in the United States. You have to have a remedy, a redress in a foreign court. And when you do, that was accomplished here as part of the State Department's diplomatic efforts. They're trying to do two things. Fight the insurgency, which is, after all, Colombia is the third largest recipient, as the record shows here, of U.S. military aid after Israel and Egypt. So there's a big effort to fight the insurgency with U.S. purchased helicopters and training and all of that. At the same time, help the Colombian judicial institutions to address human rights abuses, and that's why the district court said we would be showing a lack of respect for that preferred approach by the executive branch if we went ahead with the litigation of this case. Why is that? Why does that show a lack of respect? Because what the State Department has said in their SOI is, if you're going to have another case here that's duplicating and second-guessing what happened in this Colombian proceeding that resulted in a 90-page opinion and judgment, you're going to be expressing, through that process, a disrespect, a lack of regard for the Colombian efforts to address this on their own. Usually when you talk about disrespect, you're talking about a record that is not present here. Do you agree with that? Talking about what? Usually when you talk about disrespect, you're talking about a record that is not present here. Well, I think the record here is very similar to the record in the Whiteman case in the Second Circuit. That's the case where there was a dismissal based on the same fourth Baker test in a situation where the United States had urged the court to defer to the remedy for recovery of the Paul Tosca case. Yes, yes, and that's what I'm talking about, because there hasn't been that request in this case, has there? There's been in the United States, but they haven't asked that this action be dismissed. Your Honor, I believe they have. That's exactly what the brief filed by the United States in this court says. We seek dismissal, affirmance of the dismissal, for particularized foreign policy reasons. The first sentence of the U.S. brief quotes that statement from the State Department saying adjudication will have an adverse effect on our foreign policy interest. That's exactly what they're seeking. Now, they're suggesting that the court need not reach the constitutional issue of political question. We think that's perfectly appropriate. We did raise international comedy in the district court. We did raise it in our brief. It's been fully briefed, so we support that ground. But whether you go to political question or whether you use the international comedy rationale, at the heart of this is our foreign policy as expressed by the State Department with a full record of efforts to promote the Colombian judiciary's efforts to look at the human rights issues and address them. That's exactly the foreign policy that the State Department expressed in a statement of interest. And they're saying, if you have a duplicative case, second guessing, here in the United States, you'll be disrespecting, if you like. You will not be deferring, that's the notion of comedy, to that case in the, to the Colombian proceedings. Council, council, I have a question. So, how are the comedy and political question issues affected by the fact that Occidental is not a party in the Colombian proceeding. And conversely, the Colombian government entities are not a party in the US District Court case. That circumstance does not affect the viability of those two doctrines at all, Judge Gould, for this reason. The action brought in Colombia was brought for a full, to fully compensate the plaintiffs for their injuries. Now, they could have sued Occidental as well, but they don't have to. Just like in a plane crash, you can just sue the airline, collect all your damages from the airline. And the airline can go after the manufacturer if they want to. So, what, all that happened here, excuse me if I, if you had another question, but all that happened here is that, that the plaintiffs chose to sue the, the, the military only. They recovered their full damages, not just a little piece of it, under Colombian law, and therefore, they, they can't get more damages under the single recovery rule from Occidental. That's a neutral legal principle that applies across all jur, many jurisdictions. The rule in Colombia is once you've brought this lawsuit to collect for your injuries from the government, you can't sue somebody else and get a duplicative recovery. That's the law in California as well. So, the fact that Occidental wasn't named, well, it could have been, is, is, is no impediment to the application of international comedy or the, the political question doctrine. Let me address counsel's argument that somehow international comedy could be respected here if you just went back to the district court and litigated this case. That, that, that appeared to be counsel's, counsel's suggestion. That's, that is, that is not applying the rule of international comedy. Because what comedy says is the Colombian courts have taken charge of this problem. They have yielded a substantial remedy for plaintiffs. We're going to let them, we're going to defer to them and, and the rule of the Colombian legal system. We're not going to go back and litigate this case while we are, are and claim that we're somehow deferring to Colombia. Because, because we would not. You wanted to leave some time for the United States, I think you indicated. Yes, Your Honor. You said it, you said it. Okay, so go ahead. No, you go ahead. I was thinking you needed five minutes, but she, she said it so that you're in your time. Go right ahead. The, the, the, the effort by appellants and plaintiffs here to portray the State Department's interest as weak, as, as not seeking dismissal, is really belied by the full record here of the efforts by the State Department, which have been ongoing beginning back in, in January of 2003. And even before then, the State Department briefing, which is part of the record, says the Secretary of State was down meeting with the Minister of Defense and the Senior Commander saying, we want you to address this through your own institutions. That has continued, that has produced a substantial recovery for, for, for plaintiffs. And, and that is the heart of the foreign policy interest, which the, the State Department has, has asserted here. Now, appellants assert that the international comedy doctrine can't apply because there's no conflict here. That, that, that's simply not the case. There is a fundamental conflict between the notion of the, the way the Columbian courts are handling this case, which is full recovery to the plaintiffs, they can't double recovery with a, double recover with a lawsuit against Occidental. And plaintiff's position is, which is they get to bring a separate lawsuit here in the United States. So there, there, there is a conflict. And under the Ungaro-Benajez case in the 11th Circuit, which involved a similar issue of deferring to an alternative remedy scheme. It's one of the Holocaust survivor cases. That's, that's a compelling precedent for what's going on here. Deferring to the alternative remedy in Columbia. The, let me just address briefly before I cede the remainder of my time. To the, the foreign affairs doctrine, which, which counsel addressed. That the district court properly concluded that state court claims here were preempted by the strong foreign policy interests of the United States. Which precluded the bringing of, of state law claims. And those same compelling foreign policy interests that established constitutional preemption of the state law claims. That's the same analysis that applies to international comedy. It applies under the, and, and applies under the political question doctrine. And the district court found that those were compelling interests as established in the record here. Thank you. Thank you. Your honors, and may it please the court. Sharon Swingle from the Department of Justice for the United States. I'd like to begin by thanking the court for allowing me to participate this morning. I welcome the opportunity to present the foreign policy interests of the United States that are implicated by this litigation. And as we've set out in our brief, although the district court weighed and considered those foreign policy interests under the political question doctrine. We think it is appropriate for this court first to consider, before addressing the constitutional question of justiciability, whether those same interests would alternately support dismissal as a matter of international comedy. I think the international comedy doctrine is particularly appropriate here because many of the nature of the interests identified by the United States in the district court relate specifically to the existing and ongoing legal proceedings in Colombian courts relating to the very same underlying dispute, which is the basis for the plaintiff's claims. The plaintiffs here have chosen to bring suit for those foreign policy interests that have caused harms in Colombian courts. They did so long before they ever instituted the case here. They have won a substantial monetary judgment based on the Colombian court's findings that the bombing was carried out by Colombian Air Force officers acting in violation of international law, and that the Colombian government is responsible for the full amount of the harm incurred. Now, that decision is on appeal. It is pending, and it is entirely appropriate for this court to dismiss the claims awaiting the outcome of that proceeding. I would note also that there are ongoing criminal prosecutions of two of the three Air Force officers involved in the bombing. And again, the manifest possibility for tension, conflict, or second-guessing by the district court of those Colombian proceedings implicates significant foreign policy interests on the part of our government. I think this case is a particularly appropriate one as well for application of comity because of the nature of the other issues that the plaintiffs have asked this Court to resolve, ranging from the political question doctrine to foreign affairs preemption to the scope and breadth of the alien tort statute. There could not be a more difficult set of issues, I think, to bring before this Court, and yet the consideration of them is completely unnecessary as a straightforward matter of a neutral principle of comity. Had the plaintiffs sought to bring these very claims now in the Colombian court system, we have evidence in the record from the defendant's expert that the claims would be suspended pending the outcome of the existing appeal, and then resolved in accordance with that appeal. And I think the same approach is appropriate here to discourage the kind of international foreign chopping that we get when we do not give force and effect to the decisions of foreign courts. As we've noted, we don't think it's necessary for the Court to consider either the alien tort statute question on which we briefed or the question of the foreign affairs doctrine or what we view as a sort of lesser included version of that dismissal in this case. As the Court is aware, the decision in Sarai, the vía chincho, was amended this past week in a way that makes clear that the Court has not yet addressed the question whether the alien tort statute would permit the recognition of a cause of action for aiding and abetting a violation of international law. I think under the standards set out by the Supreme Court in Sosa, there is not an adequate basis for recognizing such a cause of action. There is no clearly defined specific norm with universal acceptance, as the Court required in Sosa, of civil aiding and abetting liability. To the extent that there are precedents that the plaintiffs have identified, they are almost exclusively in the context of criminal violations or in the context of a straightforward substantive law norm. And as a matter of Federal law, the Supreme Court's holding in Central Bank tells us that that is not enough to imply a private right of action for civil aiding and abetting liability, an implication that would be particularly anomalous in the context of the alien tort statute, where in a post-eerie world, we have an understanding of the Federal common law as a very narrow and incremental set of authorities, which certainly would not permit the kind of plenary incorporation of the federal law in the context of tort law that the plaintiffs have asked this Court to endorse. In addition, I think Sosa really cautions the Court against the exercise of Federal common law authority in an area with significant potential to interfere with our foreign relations. And it is difficult to imagine a more compelling set of circumstances in which that would be the case, not only because of the aiding and abetting nature of the claim, but also because it seeks to challenge ultimately the lawfulness of the conduct of a foreign government in its military actions against its own citizens within its own borders. And in that context, I think there should be a particularly high hurdle before the Court were to recognize a common law claim. Finally, the common the choice of law issue, I think we've briefed in our amicus submission as well, whether under Federal choice of law principles or State choice of law principles, I think the interest balancing here clearly favors application of Columbian law to this dispute rather than the law of California, the only connection of which is the residence of the defendants here. If the Court has no questions, we would ask the Court to affirm. Roberts. I'm not sure how many minutes I have, but first of all, let me address the 4M Chapping argument, because that's pretty outrageous. Our clients sought relief in Columbia. They wanted to stay in Columbia. They had no interest in coming to the United States or Canada. They were driven out by the government and by paramilitaries, and the record is replete with the specific death threats that caused these plaintiffs now to be in asylum in Canada and in the United States. They can't go back without being killed, and the district judge knows that and knew it. And that's why the Occidental could be sued in its home city rather than forcing the plaintiffs to go down to Columbia and get killed. And so there's a reason. There's not 4M Chopping. This is the only game in town for them to get relief. With respect to international comedy, they have yet to cite a case that applies international comedy in anything even remotely close to the facts of this case. In fact, the citation to Whitman and Ungaro demonstrate how far afield this is. They're asking this court to defer to a Colombian procedural rule. That's really what it's about, and that can be resolved on remit when there's a final judgment, and that can be dealt with. There is absolutely not one case, and the government doesn't even come close to citing a case, that says that international comedy and dismissal at this stage is appropriate because there might be the application of some rule based on some judgment that might be final at some point. Mr. Hoffman, what he's arguing, and maybe I understood something that he wasn't arguing, but he's not talking about perspectively. He's talking about an action that has already taken place in Columbia with a result. Well, in that case, it's even easier. And actually, it doesn't actually matter, I think, under Rio Tinto whether it's prospective or retrospective. But in Ungaro's perspective you're arguing about the inability to go back, which may or may not be true, but we aren't going to decide it on that point. For international comedy, Rio Tinto makes it clear. There has to be a true conflict. What a true conflict means, there has to be parallel proceedings with the same parties, meaning Occidental Petroleum. The Occidental Petroleum is not a party to the Colombian proceedings, so that's the end of the matter. There's no true conflict. There's no parallel proceeding. The doctrinal requirements of international comedy are simply not satisfied. Rio Tinto reaffirms the law in this circuit, which is the law, I believe, in other circuits as well, that you have to have that kind of conflict. That's what international comedy is about. There may be other issues where these issues come up in some other way, but not this one. And the U.S. government, again, they've introduced this argument. Occidental didn't make this argument in the district court. They didn't say that it had to be dismissed on the basis of international comedy. Moreover, international comedy is abusive discretion standard, and this district court considered all the arguments about all of this stuff with respect to international comedy and forum non-convenience and decided that Los Angeles was the most appropriate forum and that he would not defer either for international comedy or international abstention reasons. And the record is absolutely clear that there was an ample basis for the exercise of that discretion based on all the factors in this case. He went through all of them. He considered everything that was said, including the Department of State. With respect to the final matter that the – and by the way, the issue about what the Columbian proceedings actually mean and what their impact is is hotly debated in this case. It was debated in the context of forum non-convenience, so it really didn't have to get decided. Our expert witnesses say that we could not have – our plaintiffs could not have brought accidental into that proceeding. Our experts say that they are not barred by the devilry recovery rule. Our experts say that that judgment doesn't provide them full damages, and that has to get decided at some point. It can't just be stated in the same way that Mr. Spiegel has said things about what the statement of interest says that are nowhere in the statement of interest. If you read the statement of interest, it doesn't say those things. It doesn't say anything about our case. It doesn't say anything about U.S. involvement in our case. It just is silent about that. It talks about the general foreign policy interests of the United States, which are another way of saying all the same things that this Administration has said, because it doesn't like the Alien Tort Statute. It disagrees with the policy that Congress has adopted in the Alien Tort Statute and reaffirmed as recently as the early 1990s in the Torture Victim Protection Act. They disagree with that. And their arguments were rejected in SOSA, down the line, including this argument that you can't look into the way foreign governments treat their own citizens, which is at the heart of the entire line of Alien Tort Statute cases that started in 1980 with the Fulardiga decision. And because my time is about six minutes, six seconds, I would say that the arguments that the government has made about SOSA and Central Bank and all the other things are laid out both in the amicus briefs and our briefs, and also I would submit to you that the Ninth Circuit last week in Rio Tinto in its decision laid out all the reasons why the pre-SOSA analysis in this circuit still applies and why aiding and abetting liability is available under the Alien Tort Statute. Thank you very much, Your Honor. Thank you for your argument. The case just argued is submitted.
judges: Farris, Gould, Cff, Duffy